1    IN THE DISTRICT COURT OF THE FOURTH JUDICIAL DISTRICT OF THE

2              STATE OF IDAHO, IN AND FOR THE COUNTY OF ADA

3                        MAGISTRATE DIVISION

4                  BEFORE L. ALAN SMITH, MAGISTRATE

5

6    THE STATE OF IDAHO,              )
                                      )
7              Plaintiff,             )
                                      )
8    -vs-                             )          Case No. 10252
                                      )
9    THOMAS EUGENE CREECH,            )
                                      )
10             Defendant(s).          )

11   _____

12

13

14              TRANSCRIPT OF PRELIMINARY HEARING

15                        BOISE, IDAHO

16                        MAY 29, 1981

17

18   CHARGE(s):

19        Murder in the First Degree, a Felony.

20

21   APPEARANCES:

22        JIM HARRIS, Esq., Ada County Prosecuting Attorney, Ada
          County Courthouse, Boise, Idaho, appearing for and
23        on behalf of the Plaintiff.

24        ROLF KEHNE, Esq., Public Defender, 303 W. Bannock, Boise
          Idaho, appearing for and on behalf of the Defendant.
25

COST:   $194.00

**EXHIBIT   W**

I, Frederick C. Lyon, Clerk of the Supreme Court of the State of Idaho, do hereby certify that the above is a true and correct copy of the document entered in the above entitled cause and now on record in my office.
WITNESS my hand and the Seal of this Court 4/11/96.

FREDERICK C. LYON          Clerk

By: _____        Deputy

1

$$I\ N\ D\ E\ X$$

2

3   <u>WITNESSES CALLED BY THE PLAINTIFF</u>:

<u>Page</u>

4

5   SCOTT, Delbert E., M. D.
              Direct Examination                13
6             Cross Examination                 24
              Redirect Examination              31

7
    MAHONEY, Dan Robert
8             Direct Examination                32
              Cross Examination                 45
9             Redirect Examination              52

10  DOUTHIT, Dan
              Direct Examination                53
11            Cross Examination                 67

12  PALMER, Chuck
              Direct Examination                71
13            Cross Examination                 84

14

15                    E X H I B I T S

<u>Marked</u>    <u>Admitted</u>

16

17  State's Exhibit Nos. 1 through 6                    18

18  State's Exhibit Nos. 7 through 10                   40

19  State's Exhibit No. 11             45       45

20  State's Exhibit No. 12             60       61

21  State's Exhibit No. 13             74       74

22

23

24

25

T-98
1147

1       THE COURT:  .....for the Preliminary Hearing, in the case

2   of the State of Idaho vs. Thomas Eugene Creech, Case 15C-1995.

3   And the record may reflect, the Defendant is present in court,

4   along with Counsel of Record, Mr. Kehne, of the Public Defender's

5   Office and Mr. Harris, appearing on behalf of the State of Idaho

6   and the Ada County Prosecutor's Office.  Are there any prelim-

7   inary matters, prior to evidence?

8       MR. KEHNE:  We move, first, to vacate the courtroom, to

9   close the courtroom.

10      THE COURT:  Alright.  That will be granted.  You're moving

11  to exclude witnesses, or.....

12      MR. KEHNE:  Yes.

13      THE COURT:  .....for a Closed Preliminary Hearing?

14      MR. KEHNE:  And for a Closed Hearing.

15      THE COURT:  Alright.  I'll grant the motion.  Under the

16  statute, I think the Court has to.  All persons, including wit-

17  nesses, will be excluded and we'll call you, as you're needed.

18      (Sotto voce)

19      STATESMAN REPORTER:  Judge,...I'm with the Statesman.

20  I'd like to protest this...Closed-- Closed Hearing.

21      THE COURT:  Well, you can do that.  But, the statute

22  requires the Court, to do so, on motion of a Defendant.

23      STATESMAN REPORTER:  Well,...our attorney is...prepared

24  to make a number of...arguments against close-ins like--

25  close-ins like this.  And...if you'd like, I could...call him

1150

1    and he could come down here and argue that, for you.

2          (Pause)

3          THE COURT:  Well, I guess you can have him here, if you

4    want.  But, I'll read you the statute.  "The Magistrate must,

5    upon the request of the Defendant....."  And it says "must."  I

6    don't have any discretion, in the matter-- "exclude from...the

7    examination, every person except his clerk, the Prosecutor and

8    his Counsel, the Attorney General, the Prosecuting Attorney of

9    the county, the Defendant and his Counsel, and the officers

10   having the Defendant in custody.

11         (Pause)

12         THE COURT:  That's 198-- 19-811, of the Idaho Code.  So,

13   I don't-- you know, I don't think the Court has any choice, in

14   the matter.  Under that statute, its required to do so and the

15   statute says the Court "must."  So, I'll grant the motion.

16   You'll have to wait outside.  If you want to have your counsel

17   down here, later, to argue it, I guess he can.  But.....

18         STATESMAN REPORTER:  Okay.  Thank you, Judge.

19         THE COURT:  Okay.  Thank you.

20         MR. KEHNE:  Our next motion is to vacate and continue

21   this hearing, Your Honor.  There are two grounds.  One of...them

22   that I...really can't do anything about, or couldn't have done

23   anything about, is that, right now-- it won't be a lasting con-

24   dition, but, right now, we represent two people, with definite

25   conflicts of interests.  One of them, conflicting with Mr. Creech,

2

1156

1   is attempting to make deals, with the police, for testimony,

2   that would be very harmful to him.  And I would be unwilling, to

3   go to anything so-- any type of hearing, so critical, as long as

4   our...office is in that posture.  I think, it would be a built-

5   in error. It would, definitely, violate Mr. Creech's rights, to

6   effective representation.  The other ground is, I do not, in my

7   professional judgement, feel sufficiently prepared, to go through

8   this preliminary hearing.  There are several reasons, for them--

9   for that, but, not the least of which, is that this client, with

10  whom we have the conflict, now, was talked to, at length, last

11  night at the jail when we got out of court, for the day.  And that

12  discussion uncovered a great deal of stuff, that I feel,

13  absolutely, must be followed up, before we proceed to a prelim-

14  inary hearing.  On top of that, also, we...requested police

15  reports and Mr. Harris agreed, in principle, to provide those.

16  But, he was under a misunderstanding, about who was representing

17  Mr. Creech.  And so, those were denied us.  And that kind of

18  slows down our ability, to prepare a preliminary hearing, in ten

19  days, considering a public defender's other case load.  It is

20  possible, that we could have talked to everybody.  But, I mean

21  it-- just, with the realities, of our case load, that's just not

22  to be expected.  It would be my view, that this preliminary

23  hearing is almost as important, as the actual jury trial, itself.

24  And preparation for this preliminary hearing, is as important,

25  as preparation for a trial.  Therefore, I would say that, if we

3

1160

1   proceed, today, with the Preliminary Hearing, Mr. Creech would

2   not receive effective representation, by Counsel.  We would waive

3   time limits.

4       THE COURT:  Mr. Harris, did you want to be heard, on that?

5       MR. HARRIS:  Well, yes.  For the record, I'd...object to

6   it, Your Honor.  Although, I don't think the Court has any...

7   choice in the matter, based on the statements of Defense Counsel.

8   I would, however, for the record, inform the Court that, on

9   Monday of this week, Mr. Klaus Wiebe was informed of a potential,

10   or probable, conflict, in this case.  And it was my understanding,

11   at that time, from Mr. Wiebe, that Conflict Counsel would be

12   appointed, by the Public Defender's Office, pursuant to their

13   procedures.  And...in fact, I think that one was appointed.  On

14   Wednesday, more specific information was passed on to Mr. Wiebe,

15   regarding what, in fact, the conflict was, that we saw, or

16   potential conflict.  So, it would be my opinion, that the Public

17   Defender's Office had-- has had adequate time, to arrange for

18   other Counsel, if, in fact, it was necessary.  I would only

19   request, that if the Court does, in fact, grant the continuance, I

20   would request two things.  First of all, that they-- that the Court

21   reset the Preliminary Hearing, within the next two weeks, because

22   of the...import of this matter and the necessity to get it moving.

23   And secondly, that any costs incurred to my office-- pursuant to

24   the subpoenas, which were outstanding, have been outstanding,

25   for the last seven days-- that any costs incurred, to my office,

4

1164

1   be assigned to and made the responsibility, of the Public Defen-

2   der's Office.  For purposes of cost, due to the continuance

3   requested by the Public Defender's Office.

4       THE COURT:  Well, this was set on the 19th.  Counsel

5   indicated, that this-- that today's time was agreeable.  Set ten

6   days away.  And the Defendant had not waived time limits under

7   the rule, at that time.  Apparently, he is now willing to do so.

8   But, if this conflict's been known about and some of these other

9   factors, I don't really know why they couldn't have been discov-

10  ered, prior to last night.  And.....

11      MR. KEHNE:  Judge, let me clarify what happened.  We were

12  told we have a conflict, but, I guess, on the request of his

13  police officers, Mr. Harris initially told us, "But I can't tell

14  you what it is, or who it's with."  And so, we sent Gar Hackney,

15  out to the institution, at his first convenience and Mr. Hackney

16  did talk to Mr. Creech.  And what it ended up being, is a wild-

17  goose chase.  Because, based on the conversation Mr. Hackney had

18  with Mr. Creech and some other people out there, we thought that

19  Mr. Harris was referring to somebody else, entirely.  It was

20  another one of our clients.  And the way we analyzed the situation,

21  it wouldn't be a conflict, for us.  I don't know, exactly, when

22  Mr. Harris talked to Mr. Wiebe, about who the person was, but,

23  I sure didn't know about it, until last night. And that doesn't

24  really respond to the problem, of not having any police reports,

25  provided to us.  I agree, that no formal discovery's been

5

1169

1   done,.....

2        THE COURT:  Well, of course, that.....

3        MR. KEHNE:  .....but, of course, you know, that's common

4   and it definitely does speed preparation up.  And that-- those

5   are the-- it's one of things, we assume, when we said, you know,

6   we can be prepared, within a certain day, is that we're going to

7   have the cooperation, of the State.  And get those police reports.

8        THE COURT:  Well, of course, as far as that, I don't know,

9   that...there's really anything the Court can do, about that.  No

10  motion for discovery, was made.  That motion could have been made

11  and the motion for an order shortening time, and a quick hearing

12  on the matter, if necessary, or an ex parte discovery order.

13  But, no motion for discovery's, been made.  The other problem,

14  I've got, is I...cannot possibly, reset this, until sometime in

15  late June or early July.  I'm going to be on vacation, two

16  weeks, starting June 8th and will not be back to the-- until the

17  19th.  And I don't have any time available, I don't believe,

18  until.....

19       MR. HARRIS:  For the Court's benefit, Your Honor, I don't

20  foresee this hearing, taking more than a couple of hours.

21       (Pause)

22       THE COURT:  Well, the first date I could reset it, would

23  by July 2nd or 6th.  So, we're looking at more than a month

24  away.

25       (Pause)

6

1176

1   THE COURT:  Apparently, the Prosecutor's Office wasn't

2   notified of-- that there was going to be any request, for

3   vacating the Preliminary Hearing, either.  It looks like they've

4   got all their witnesses here.  What's your position, on paying

5   those costs, Mr. Kehne?

6   MR. KEHNE:  They're all civilian witnesses, Your Honor.  And

7   I think, there is a mix-up, here.  I...couldn't have notified

8   them, before last night.  I didn't really realize, the depth of

9   the problem, until last night.  Mr. Stone went out to the jail,

10  I met him at like 9:00 or 9:30, last night.  If we do order it,

11  it's...actually ordering the county, to pull out of one pocket

12  and into another one.  Specifically, the police budget.  I don't

13  really think that's-- would be appropriate.

14  MR. HARRIS:  Well, Your Honor, to counter that, I think

15  it would be appropriate.  The question is, whether it comes out

16  of the Prosecutor's budget, or the Public Defender's budget.

17  And it seems to me, that the appropriate thing to do, would be

18  to require the Public Defender to pay it.  Just because it's...all

19  county money, I think, is beside the point.

20  MR. KEHNE:  I don't know of a provision, authorizing an

21  assessment of costs, in a criminal case, as there is in a civil

22  case.

23  THE COURT:  Well, I...think these matters could have been

24  discovered, before last night.  I'm going to deny the motion.

25  It's set for preliminary hearing, there's been ten days notice

1180

1    on it.  That should have been adequate time, for Counsel to
2    prepare those matters, or to file discovery motions, or whatever.
3    And none of that's been done and the Court hasn't been advised,
4    of any potential conflict, or that there was going to be any
5    request to vacate the matter.  I've heard nothing, in the case,
6    since that it was before me, for arraignment, on the 19th.  And,
7    apparently, the Prosecutor hasn't been notified, either, of any
8    potential problems.  Have...all their witnesses, here.  It may be
9    remanded for another preliminary hearing, but I'll leave that up
10   to the District Court.  I'm going to deny the motion.  We'll go
11   ahead with the Preliminary Hearing, here today.
12        MR. KEHNE:  Judge, I need a break to get some legal advice.
13   I don't...know whether I can comply, with the Court's order, to
14   go ahead today, when our office is in the posture, of a conflict
15   of interest.  It puts me in a terrible position.  And that's the
16   way we sit, right now.
17        THE COURT:  Well, I've got another matter, set at 11:00.
18   So, you'd better hussle it up.  We'll take about ten minutes.
19        (Court off record)
20        (Court on record)
21        (Sotto voce)
22        THE COURT:  Alright.  Resuming in the State vs. Creech,
23   the record may reflect, the...Defendant is present in court.
24   respective Counsel, of Record.  I think, as the Court has indi-
25   cated, it will deny the motion for the continuance.  Did you have

8

1185

1   anything further, in the way of preliminary matters?

2        (Pause)

3        (Sotto voce)

4        MR. KEHNE:  I'm sorry, Your Honor, I was talking to my client.

5        THE COURT:  Did you have anything further, in the way of

6   preliminary matters, that need to be taken up?

7        MR. KEHNE:  Well, while we were recessing, we straightened

8   out that Mr. Harris' statement to Wiebe, concerned another

9   potential conflict.  And we had that ironed out and it was our

10  analysis that, that particular inmate and client of ours, there

11  was no conflict of interest, with Mr. Creech, on that.  There is

12  another client, that...Mr. Harris was not referring to, at all,

13  who is Laird Stone's client.  That person has been approached, by

14  the police, on two occasions,  at least.  And they asked him to

15  take a polygraph.  He took a polygraph.  They came back and

16  told him, as I understand it, "We think we can work something

17  out.  We do not have the authority to do that, right now, and

18  we're not doing it, right now.  But, we're pretty sure, we'll

19  work something out."  In my view, that puts our office in the

20  position of representing one person, who has some information,

21  that I...would assume is very, very pertinent, to the charge, in

22  whether or not, this is First Degree Murder, or some other kind

23  of death.  In other words, the difference between death and life.

24  And that person is serving his sentence and if he got some charge

25  consideration, like he's got a pending escape, he would,...

9

1190

1   probably, be a witness.  He deserves to have an attorney, who is

2   zealously advocating and trying to sell the police, on the posi-

3   tion that they ought to be cutting him some slack, for his tes-

4   timony, against Mr. Creech.  And at the same time, our office is

5   representing Mr. Creech, against who the testimony would be

6   offered.  And we should be zealously advocating, for Mr. Creech

7   and we can't do both, at the same time.  Just-- I just feel, it's

8   a terrible conflict.  I agree, it would be much worse, if that

9   person were being called as a witness today and he is not, it's

10  my understanding.  But, I feel that there is a conflict of

11  interests, there, Judge.  I think we're representing Mr. Creech

12  and at the same time, representing somebody we ought to be zeal--

13  or, who   ght to have a lawyer, zealously advocating, getting

14  some kind of a deal, if even if it's a real small one, for his

15  testimony, against Mr. Creech.  And that just seems to be-- to

16  me, to be pretty black and white.

17          THE COURT:  Alright.  Mr. Harris?

18          MR. HARRIS:  Just a brief response, Judge.  At this point,

19  I...know that we are in agreement, as to the person we're discus-

20  sing here, as a potential witness.  No offers have been made, to

21  that individual.  I'm not even aware, that representations have

22  been made, to that individual, that an offer might exist.

23  Although, that's certainly possible, that an offer might be forth-

24  coming.  There are no plans, at this point, and I can represent

25  to the Court, that no offers have been made, to that individual.

10

1193

1  I'm not even certain, at this point, whether that individual

2  will be a witness, in this case.  I think, certainly, until that

3  determination is made, there is no actual conflict.  Although,

4  I'll-- anytime we're dealing with a crime at the State Peniten-

5  tiary, I suppose there's...potential conflicts of interest, with

6  regard to inmates, who are represented by the Public Defenders

7  Office.  But, I think we're drawing the line a little close,

8  where we have it, an individual who is merely a witness to the

9  crime and may testify, at some point, in the...hearing.  I will

10  represent that immediately, if I determine that A, this indivi-

11  dual becomes a witness, to be called at trial or subpoenaed, or

12  B, that an offer is deemed necessary, to obtain that testimony,

13  that the Public Defender's Office, will be the first to know.  At

14  that point, there may be some conflict.  I think, however, that

15  at this stage of the proceeding, as I understand the law in this

16  area, there is not a sufficient conflict, to justify a continu-

17  ance, in this hearing.  I would...object, to the...motion, again.

18      MR. KEHNE:  I would also like, to put on the record before

19  we go, Your Honor-- before the Court makes any rulings, that I

20  made a request-- while I didn't call it discovery-- I made a

21  request, for the police reports of the State, this week.  And

22  that request was refused, because the State was under the

23  impression, that another law office, Lynn Scott & Hackney, was

24  representing the Defendant, at the time.  I sent a notice back

25  saying, "No, that's not...the case."  And we have yet, to even

11

1198

1    see the police reports.

2    THE COURT:  Alright.  The record may so show.  Well, of

3    course, the...problem with the...last matter, here, is no dis-

4    covery motion has been made, or no request to the Court, for a

5    discovery order.  And I don't really think there's anything the

6    Court can do, about that, with no motion having been made until

7    this morning, the day of the Preliminary Hearing.  It has...been

8    set some ten days ago, which I admit, isn't a great deal of time.

9    But, certainly,...both the State and the Public Defender, have

10   known of...this setting, for ten days.  As to the other matter,

11   on the conflict, I don't see that there is such a conflict at

12   the preliminary hearing stage, that it would warrant continuing

13   the matter and vacating it and resetting it.  Although, I think

14   it's primarily.....

15          (Sotto voce)

16   THE COURT:  .....the Public Defender's obligation, to

17   determine its conflicts, and not the Court's.  I could...see it,

18   if this person were being called as a witness, today, at the

19   Preliminary Hearing.  And...some arrangement, already had been

20   made, that-- or, some deal made, for his testimony.  But that

21   doesn't appear, to be the case.  Now, it may be later, or cer-

22   tainly it may prove to be at...trial, or prior to trial.  But at

23   the preliminary hearing stage, I don't see that there's such a

24   conflict, there,...that would warrant a continuance, in the

25   matter.  So, for those reasons, again, I'll deny the motion and

12

1202

1  we'll proceed with the...Preliminary Hearing, here today.   And

2  the record may reflect, it is over Mr. Kehne's objection.   Any

3  other matters?

4       MR. HARRIS:   No, Judge.

5       MR. KEHNE:   No.

6       (Sotto voce)

7       THE COURT:   Did you want the complaint read, Mr. Kehne?  Or have.....

8       MR. KEHNE:   We'll waive that, Your Honor.

9       THE COURT:   You've got a copy?

10      MR. KEHNE:   Yes.

11      (Sotto voce)

12      THE COURT:   Alright.   You may call your first witness,

13  then, Mr. Harris.

14      MR. HARRIS:   Doctor Scott.

15

16  THEREUPON:

17      DELBERT E. SCOTT, M.D., was called as a witness for and

18  on behalf of the Plaintiff and, being first duly sworn upon his

19  oath, was examined and testified as follows:

20

21              DIRECT EXAMINATION

22  BY MR. HARRIS:

23      Q   Doctor, would you state your full name and spell your

24  last, please?

25      A   Delbert E. Scott, S-C-O-T-T, M.D.

                        13                    Scott
                                              Plf-Di

1204

1   Q   Okay.  Dr. Scott, what is your profession?

2   A   Physician, specializing in the practice of pathology.

3   Q   How long have you practiced, that specialty?

4   A   Fifteen years,.....

5   Q   Has that been here, in Boise?

6   A   .....as of July 1st, forthcoming.

7   Q   Here, in Boise?

8   A   Yes.

9   MR. HARRIS:  I might suggest, at this point, a stipulation,

10  with regard to Mr.-- to Dr. Scott's specialty and his education

11  and training, in the field of pathology.

12  MR. KEHNE:  Yes.  That'd be fine.

13  THE COURT:  It is so stipulated.  Alright.  The record

14  may so reflect, it is stipulated, then, that this witness is an

15  expert witness, in the field of pathology.

16  Q   Doctor, where are you, currently, practicing pathology?

17  A   Boise, Idaho.  Primarily based, at St. Alphonsus Hospital.

18  Q   Okay.  Doctor, have you had an opportunity, or did you

19  have an opportunity, on or about the 13th day of this month, to

20  do an autopsy on an individual indentified, to you, as David

21  Jensen?

22  A   14th of May.

23  Q   Okay.  I'm sorry, 14th of May.....

24  A   Yes.

25  Q   .....What was the purpose, of that examination?

14

Scott
Plf-Di

1206

1    A   To assess the extent of injury, of the...person,.....

2    Q   Okay.

3    A   .....and cause of death.

4    Q   Okay.  Was Mr. Jensen's state, that of being a cadaver,

5    at the time of your examination?

6    A   Yes.

7    Q   Okay.  What procedure did you follow, with regard to

8    determining those factors?

9    A   Well, we examined the external surface of the body

10   and...obtained some blood samples.....

11   Q   Okay.

12   A   .....Deputy Coroner Sonnenberg obtained the blood

13   samples.  And...took a number of pictures.....

14   Q   Okay.

15   A   .....or a number of pictures, were taken, by the people,

16   who were present.

17   Q   Okay.

18   MR. HARRIS:  Through the courtesy of the bailiff, I'll have

19   handed, to the witness, Exhibits marked 1 through 6-- State's

20   Exhibits 1 through 6, for purposes of the Preliminary Hearing.

21   Q   Doctor, would you look at each one of those photographs,

22   first of all, and tell me, whether or not, you recognize those

23   six photographs?

24   A   Yes.

25   Q   What are they?

Scott
Plf-Di

1210

1   A   These are photographs of the head, upper torso, of the

2   decedent.

3   Q   It's this same individual, Mr. Jensen?

4   A   Yes.

5   Q   Do those pictures...accurately reflect, the conditions

6   or circumstances, that you observed, as they are portrayed in

7   the photographs?

8   A   Yes.

9   Q   Okay.

10   MR. HARRIS:   I'd move, for the admission of 1 through 6.

11   THE COURT:   Would you show them to Counsel, please?

12   (Pause)

13   MR. KEHNE:   Would you show these to the witness, again?

14   Doctor, I'd like you to go through those and tell me, as to each

15   picture and refer to it by number, please, whether you had

16   changed the body, by the time you took that picture.  And if so,

17   what changes, you'd made?  For instance, I assume, on number 1,

18   maybe you shaved the head or.....

19   A   No.  This individual was,...apparently alive, when he

20   was operated upon, by...a neurosurgeon.....

21   MR. KEHNE:   Okay.

22   A   .....And thus, the shaving of the scalp, as well as

23   the...extensive...curvilinear surgical incision, of the left

24   side of the cranium.  And...as you can note, here, there is an

25   extensive depression of the lateral aspect of the...left side of

16                    Scott
                      Plf-Di

1216

1    skull.....

2         MR. KEHNE:  Are you referring.....

3         A  .....This was the site of...a cranioplasty,...which

4    was, apparently, sub-- subsequent to a self-inflicted gunshot

5    wound,...in the past.

6         MR. KEHNE:  Alright.  I'll not.....

7         A  Apparently, the surgeon made this incision, extending

8    from here (indicating), back posteriorly and back around to in

9    back of the ear, deflected this k-- large flap, removed these

10   fragments of the cranioplasty material, which I did see,...

11   subsequent to the autopsy.  And...also, there was a slight

12   extension of the...defect,...that was-- preexisted.  There was,

13   additionally, a fract-extension (phonetic), a fracture extending

14   from the ma-- margin anteriorly, in the temple region, from

15   the...cranioplasty defect.

16        MR. KEHNE:  Okay.  Can you...go through those pictures

17   and refer to them by number and tell them-- tell me any changes

18   that you, or Mr. Sonnenberg, or anybody.....

19        A  Oh.  The-- the one thing.....

20        MR. KEHNE:  .....made, before the pictures?

21        A  .....of course, is...in item number 6,.....

22        MR. KEHNE:  Okay.

23        A  .....which is... merely a portrayal, after deflection

24   of these...flaps, at time of autopsy, just demonstrating...resi-

25   dual hemorrhage and the slightly shrunken state of the brain,

17                          Scott
                           Plf-Di

1220

1   due to the pre-- previous self-inflicted wound.....

2          MR. KEHNE:  Okay.  Now, 1.....

3          A  .....So, it's...alteration, at time of autopsy, which

4   was number 6.

5          MR. KEHNE:  Okay.  As far as 1 through 5 go, that is

6   essentially, the.....

7          A  One through 5 are unaltered.

8          MR. KEHNE:  Okay.  That's a condition.....

9          A  Yeah.

10         MR. KEHNE:  .....indicating.....

11         A  Yeah, right.

12         MR. KEHNE:  Alright.  I have no objections, to their

13  admission.

14         THE COURT:  Alright.  State's 1 through 6 will be admitted.

15         (State's Exhibits Nos. 1 through 6, admitted.)

16         MR. HARRIS:  Could we have those marked and then, rehanded

17  to the witness, please?

18         (Pause)

19         Q  Okay.  Doctor, you've been rehanded what has now been

20  admitted, State's Exhibits 1 through 6.  Could you utilize those

21  photographs, as necessary, to amplify your testimony and refer-

22  ring to them by number, if you use them?  And just go ahead and

23  tell, in your own words, what you...did, with regard to your

24  examination to determine cause of death.  And what you observed,

25  on or about, particularly the head and throat areas, of the

18                                    Scott
                                      Plf-Di

1224

1  cadaver, in question?

2       A   There were extensive contusions, abrasions, and...

3  several lacerations, of the...face; upper trunk and-- anteriorly,

4  and the...scalp.  And the three major lacerations, involved the

5  midfrontal scalp, right about the hairline, or where the hair-

6  line would have been.  And posteriorly, over the occiput and one

7  in the right temple region.  These were irregular lacerations,

8  so called stellate, like a starburst,...with...maximul dimension

9  force C-M (phonetic).....

10      Q   Could you determine that those were not.....

11      A   .....not quite two inches.

12      Q   .....Could you determine, that those lacerations, were

13  not surgically.....

14      A   No.

15      Q   .....implanted?

16      A   No.   The sur-- sole...surgical...incision is observed

17  in-- a little bit in s-- photo-- photo 1.   ...And...the anterior

18  aspect, in...photograph No. 2, which shows a closed incision,

19  extending posteriorly.

20      Q   So, you're saying that...the other lacerations, the

21  starburst, were not.....

22      A   Yes.   Those were...subject-- result of traumatic

23  wounds, or.....

24      Q   Alright.

25      A   .....injury.

19                          Scott
                            Plf-Di

1228

1    Q   What would the starburst effect, indicate to you, by

2    way of cause of injury?  Anything?  Or type of injury?

3        A   A significant amount of force.

4        Q   Applied to the area?

5        A   Yes.

6        Q   Okay.  Go ahead.

7        A   Additionally, in photograph...1, you can see extensive

8    ecchymosis and swelling-- bruising and swelling of the...s--

9    left...eye and the orbital tissue, surrounding the eye.  ...There

10   was a slight amount of ecchymosis,...compared to the left, of

11   the right eye, as well.  But, no significant swelling.

12       Q   Ecchymosis is bruising?

13       A   Bruising, yes.  The...hemorrhage into the tissues.

14   ...Additionally, there were numerous...superficial lacerations,

15   brusion (phonetic)-- abbrasions, and...contusions, or bruises, of

16   the scalp, face, lip, chin, and upper portion of the chest and

17   neck,.....

18       Q   Okay.

19       A   .....anterior neck.....

20       Q   Okay.

21       A   .....Now, No...3 shows the...stellate laceration, over

22   the...mid-occipital region, posteriorly, over the prominence of

23   the posterior part of the skull.

24       Q   Okay.  Could you go ahead and point, again, to the

25   location, po-- using your skull, where that would...occur?  Okay.

1233

1    MR. HARRIS:  Could the record reflect, that the Doctor is

2  pointing to the...rear of his skull.....

3    A   Prominence of my.....

4    MR. HARRIS:  .....directly, behind.....

5    A   .....skull.

6    MR. HARRIS:  .....the ears?

7    THE COURT:  Yes.  It may so show.

8    Q   Go ahead, Doctor.

9    A   ...The laceration of the...right temple region, is...

10 also evident in...photo No. 3,...at the right aspect, of the...

11 margin of the photograph.  The photos Nos. 4 and 5, show...

12 extensive...abrasions, contusions of the...anterior neck, lower

13 neck, and upper anterior chest.  In conjunction with this, upon

14 subsequent dissection of the underlying...neck organs,...

15 including the larynx, there was extensive hemorrhage of the soft

16 tissue, about the larynx.  ...No.....

17   Q   Where is the lar.....

18   A   .....associated fracture.

19   Q   .....Where is the larynx located?  Mid-throat area?

20   A   The larynx is...Adam's apple and below.....

21   Q   Okay.

22   A   .....for about an inch.

23   Q   What did you do.....

24   A   This was.....

25   Q   Go ahead.

21                    Scott
                      Plf-Di

1236

1    A  .....incidental, in that,...obviously, he had been

2   subject to...surgery, perhaps with...anesthesia and...was not a

3   significant factor, as to cause of death.

4    Q  Okay.  Go ahead.  What did you do, then?

5    A  ...The-- upon subsequent examination, of the interior

6   of the skull, after deflecting the skull flaps, there was a

7   moderate amount of residual hemorrhage, within this...space,

8   underlying the flaccid overlying scalp.  Which,...after...these

9   blows, of the scalp, apparently fractured the cranioplasty mater-

10  ial, which was in place. And...this was removed, at time of surgery...

11   Q  Did you have an opportunity, to examine, that cranio-

12  plasty material?

13   A  Yes, I did.

14   Q  What is the use of cranioplasty material, such as that,

15  medically?

16   A  ...Merely,...to restore...contour of the scalp, as well

17  well as to form, at least in some measure, protection.  Although,

18  it certainly is not,...of the...substantial...structure of...

19  hu-- human bone.....

20   Q  Okay.  So, it would be some.....

21   A  .....and it's much more readily subject to...fracture.

22   Q  It is used, though, as a replacement for the bone,

23  where necessary, in the skull?

24   A  Yes.

25   Q  Okay.  Go ahead.

Scott
Plf-Di

1240

1  A  ...There was some residual hemorrhage.  I don't know

2  the amount  of hemorrhage,...that was evacuated, at time of

3  surgery.  The...brain,...showed...some evidence of contraction,

4  associated with the former injury.  And there was,...on micro-

5  scopic examination, I could see the evidence of old...disruption

6  and injury with so-called gliosis, which is a proliferative

7  reaction of the supportive cells, of the...brain substance, and

8  is associated with injury.  ...Evidence of old hemorrhage and

9  some particulate...material, black, which I...presumed to be...

10  particulate powder debris, subsequent to the old gunshot wound.

11  Q  Okay.  Were you able to formulate a...opinion, as to

12  the cause of death, for this individual in question?

13  A  Severe, traumatic injury of the brain.....

14  Q  Okay.

15  A  .....Left side, of the brain.

16  Q  Okay.  Were you informed, as to the approximate time

17  of death, of this individual?

18  A  ...This individual died, on the afternoon of...May

19  13th.....

20  Q  Okay.

21  A  .....late afternoon.

22  Q  Who informed you, of that?

23  A  ...I presume, Erwin Sonnenberg.

24  Q  Okay.  He's the Deputy Coroner?

25  A  Yes.  Chief Deputy Coroner.

1245

Q   Okay.   What happened to the...acrylic plastic material,
you've talked about, that was evidently removed, at time of
surgery?   Do you know?

A   Yes.....

Q   What?

A   .....That's retained in our storage, at...St.
Alphonsus, in the surgical.....

Q   Okay.

A   .....path lab.

MR. HARRIS:   Okay.   That's all I have.


CROSS EXAMINATION

BY MR. KEHNE:

Q   In your...opinion, the cause of death, was this trau-
matic injury to the left side of the brain?

A   Yes.

Q   Were there any other contributing causes, such as
bleeding too much, or anything else like that, you want to men-
tion?

A   No.   I felt that the...amount of blood was...not sig-
nificant as residuum of...the injury.   ...As I s-- mentioned, I
don't know the extent of hemorrhage, that was evacuated at...
time of surgery.   But, from a standpoint of...death due to blood
loss, that would not be contributory to any measure in that,
that would have been readily replaced and may've well have been.

24

Scott
Dft-X

1249

Q  Were any of the other injuries sufficient, to be a
contributing.....

A  I felt not.

Q  .....cause of death?  Did you notice anything remark-
able, in the man's general health, while you performed the
autopsy?

A  ...One other thing, is that we did obtain blood and
a...toxicologic examine was done.  ...We found a phenobarbital
level of 7.3 microgram per mil, which is a...low therapeutic
dose.  ...Which would suggest, that this individual may have been,
possibly,...subject to seizure or...convulsive seizure.  Or...
had been administered phenobarbital as prophylactic measure.  I
don't know the details, relative to his previous health status.

Q  Anything else, remarkable, you noticed, through the
course of the autopsy?

A  Yeah.  There was an incidental...finding...of a hetero-
topic pancreas of the stomach, which is not...a very common
finding.  But, every once in a while, somebody removes this.  It
was down in the gastric antrumen.  And somehow, in embryonic
development, there's a...tissue that becomes displaced.  That
was the only thing, that I recall, to make, you know, any signif-
icance.  There was minimal degree of arterioisclerosis.  ...Aside
from that, nothing remarkable, that I recall.

Q  Okay.  Can you be more specific, for me, in describing
the injuries to the brain and how that was fatal?

25                        Scott
                          Dft-X