1407

1   Creech, about his willingness, to again waive his right to

2   Counsel?

3          A   On that particular occasion, the Sheriff, Palmer,...

4   was in, alone, with him, at that time.  ...He gave him his

5   Miranda rights.....

6          Q   Okay.

7          A   .....I seen (sic) him sign it.

8          Q   Alright.  Okay.  Did you observe Mr. Creech, sign the

9   ...form, or not?

10         A   I seen (sic) the-- the form signed.  I didn't visibly,

11   see him sign it.

12         Q   Okay.  Okay.  What did you do, after you first-- well,

13   strike that.  What did you...do, immediately after obtaining, or

14   seeing the rights form obtained, by Sheriff Palmer?  Was there

15   any discussion, at that point, at the Penitentiary?

16         A   Sheriff Palmer interviewed him,...before he asked me

17   to get a re-- tape recorder and come in.  We-- and we were gonna

18   (sic) try, to tape it.  ...That's when the noise started.  And..

19   we just stopped and-- and decided to go down to...Ada County, at

20   that point.

21         Q   Okay.  Did you, then, transport Mr. Creech down to Ada

22   County?

23         A   We did.

24         Q   Okay.  Was that, immediately, done, then?

25         A   Yes, it was.  ...As soon as...we had picked up our...

1411

1  equipment and stuff, we went ahead and transported him down

2  to.....

3      Q  Okay.  Was there a later interview, then, at the Law

4  Enforcement Building, after the transport?

5      A  Yes, there was.

6      Q  Okay.  Who conducted that interview?

7      A  Sheriff Palmer and myself.

8      Q  Okay.

9      (Pause)

10     Q  Is Sheriff Palmer here, today?

11     A  Yes, he is.

12     Q  Is he planning to testify?

13     A  Yes, he is.

14     Q  Okay.

15     (Pause)

16     MR. HARRIS:  That's all I have, at this time.

17

18                    CROSS EXAMINATION

19  BY MR. KEHNE:

20     Q  Did you tape-record your five, thirteen interview, with

21  Mr. Creech?

22     A  Yes, we did.

23     Q  I assume you preserved the tape in evidence?

24     A  Yes.

25     Q  You talked to Mr. Creech on the tier, itself, before

                              67                    Douthit
                                                    Dft-X

1415

1   you took him down to the Law Enforcement Center, on the the 13th

2   of May, isn't that right?

3        A   Yes we did.

4        Q   Will you tell me the details of that discussion?

5        A   First of all, he was brought in...to the room.   I...

6   showed him a Miranda form, written form, ask him...if he would

7   fill it out, and give us a statement.   He-- he filled out the

8   first five blanks, I believe, initialing.....

9        Q   Did he make any oral response when you asked him to

10  fill it out?

11       A   Other-- just that he wanted to speak with the Sheriff.

12       Q   Okay.   There was none other?

13       A   ...Before or after the...Miranda rights?

14       Q   Well, when you asked him to fill out the card, to fill

15  out the form, did he say, yes, I'll be happy to do that?

16       A   He-- he seemed hesitant.   He-- he started to fill it

17  out, and then he-- then he stopped.

18       Q   Okay.   Did he get to the part about whether or not he

19  wanted a lawyer, at that time?

20       A   He had not asked for a lawyer, no.

21       Q   Did he get to that part, and then check he did not want

22  a lawyer?

23       A   I don't recall.

24       Q   Okay.   That form's been preserved, I assume?

25       A   Yes.

Douthit
Dft-X

1418

1    Q   Did he give any reasons for wishing to talk to Sheriff

2    Palmer?

3    A   Not any specific reasons.  It-- it was...known to me,

4    that...the Sheriff had worked with him quite a bit, and...so I

5    didn't question his...request.

6    Q   Had you met Mr. Creech before?

7    A   I believe it was the first time I ever met Mr. Creech.

8    Q   Did he seem-- was there anything remarkable about his

9    behavior, or his appearance?

10   A   Remarkable?  I don't know what you mean.

11   Q   Like being under the influence, or looking a little bit

12   dazed, or crazed, or anything?  Unable to.....

13   A   No, I.....

14   Q   .....keep eye contact, anything like that?

15   A   I didn't notice that, no.

16   Q   His behavior seemed normal to you?

17   A   Yes.

18   Q   When you tape recorded your May 13th interview, did

19   you turn the tape recorder on at the very start of the interview?

20   A   We had a consealed mike, which the...entire interview

21   was...recorded, and...also a visible tape recorder when he...

22   decided to make a statement.

23   Q   Okay.  So the Mirandization would be on the tape?

24   A   Yes.

25   Q   Would you clarify this for me, Sheriff Palmer, is-- on

69

Douthit
Dft-X

1423

1   the 14th, he's out at Seven House talking to the Defendant.   Are

2   you not in the room at the time?

3          A   ...On the first contact, when the Sheriff met with...

4   Creech, I was not in the room.   Not until.....

5          Q   Was there-- okay, go ahead.

6          A   Until the Sheriff had came out, asked for a tape recorde

7   That's when I went into the room.

8          Q   So you really have no personal knowledge about what

9   that discussion was about, in the Seven House, between Palmer and

10  Mr. Creech?

11         A   No more than what the Sheriff told me.

12         Q   Right.   Was there any tape recorder made-- or tape

13  recording made of that discussion?

14         A   No.

15         Q   Were you involved in transporting Mr. Creech to the

16  Law Enforcement Center, on either occasion?

17         A   Yes, on the...14th.

18         Q   Do you recall any statements he made that were pertinent

19  to this case, or the victim.....

20         A   No.

21         Q   .....enroute?

22         A   No, I do not.

23         MR. KEHNE:   That's all then.   Thank you.

24         MR. HARRIS:   That's all I have, Judge.

25         THE COURT:   You may step down then.   Would you hand me

1426

1   those exhibits?

2       MR. HARRIS:   Chuck Palmer.

3       MR. KEHNE:   Didn't you want to take up that plea that they

4   had at eleven o'clock?

5       MR. HARRIS:   Oh, yeah.   We have-- if we want to take that

6   plea first, that's fine.

7       THE COURT:   Oh, I don't care.   Is this your last witness?

8       MR. HARRIS:   This is my last witness, Judge.   But it's up

9   to you.   I.....

10      MR. KEHNE:   I don't care, either, Judge.

11      (Sotto voce)

12      THE COURT:   Well, why don't we go ahead with Sheriff

13  Palmer, and see if we can conclude the evidence on this.

14      MR. HARRIS:   That's fine.

15

16  THEREUPON:

17      CHUCK PALMER, was called as a witness for and on behalf

18  of the Plaintiff and, being first duly sworn upon his oath, was

19  examined and testified as follows:

20

21                  DIRECT EXAMINATION

22  BY MR. HARRIS:

23      Q   Sheriff, will you state your full name please?

24      A   Eldon C. Palmer.

25      Q   How do you spell the last name?

1429

A   P-A-L-M-E-R.

Q   How are you employed, sir?

A   Ada County Sheriff.

Q   Okay.  Is that an elective position?

A   Yes it is.

Q   How long have you been...the elected Sheriff of Ada County?

A   Nine years.

Q   ...I assume then, you were serving in that capacity on the 14th day of May, 1981?

A   Yes.

Q   Okay.  On that day, did you...become involved in an investigation dealing with a homicide at the State Penitentiary?

A   Yes.

Q   Okay.  What did you first do with regard to...that investigation on the 14th?

A   I went out to the Penitentiary...to talk to Mr. Creech at the...maximum security unit.

Q   Had you known Mr. Creech prior to the 14th day of May, 1981?

A   Yes.

Q   When did you first...meet, or come to know Mr. Creech?

A   Seven, eight years ago, another...homicide investigation.

Q   Okay.  Had you had an opportunity to get to know Mr.

1433

1   Creech quite well at that time?

2        A   Yes.

3        Q   Would it be-- well, this is somewhat leading.   Would it

4   be fair to say that you had a relationship...with Mr. Creech by

5   way of...your ability to communicate with him?

6        A   Yes.

7        Q   Okay.   Do you think you were successful in communicating

8   with Mr. Creech?

9        A   Yes.

10       Q   Okay.   What was your purpose in going out to the peni-

11   tentiary on the 14th?

12       A   ...I was out of town...the prior day, at Montana.   When

13   I got back, one of the officers in my department advised me that...

14   there had been a homicide out at the penitentiary, and that Mr.

15   Creech was involved in it, and that he wanted to talk to me.

16       Q   Okay.   Did you in fact contact Mr. Creech on the morning

17   of the 14th then?

18       A   Yes I did.

19       Q   Okay.   And that was in Seven House, did you say?

20       A   Yes.

21       Q   Were you...successful in conducting a full interview at

22   Seven House, that morning?

23       A   No.

24       Q   Why not?

25       A   There was too much noise, and confusion out there...to

73                    Palmer
                      Plf-Di

1436

1   ...go ahead and conduct it.   ...But the other inmates, and...

2   whatnot was going on, I just couldn't...complete the.....

3      Q   Did you have an opportunity however, prior to leaving

4   that location, to obtain a rights waiver form, pursuant to stan-

5   dard procedure, with regard to Mr. Creech?

6      A   Yes I did.

7      MR. HARRIS:   Through the courtesy of the clerk, I'd like

8   to have marked-- what are we, 13, 14?   13?   State's 13.

9      (State's Exhibit No. 13, marked)

10      Q   Sheriff, you've been handed what's been marked, State's

11   Exhibit No. 13.   Can you tell me whether or not you recognize

12   that document?

13      A   That's a copy of the...waiver form that I had Tom sign

14   out at the...joint, that day.

15      Q   Okay.   Is that an accurate copy, as far as you can tell?

16      A   Yes it is.

17      Q   Okay.   Did you observe Mr. Creech sign that waiver form

18   at that time?

19      A   Yes.

20      MR. HARRIS:   I'd move for the admission of...13.

21      MR. KEHNE:   No objection.

22      THE COURT:   Alright.   State's 13 will be admitted.

23      (State's Exhibit No. 13, admitted)

24      Q   Initially, Sheriff, did you-- did you begin your inter-

25   view with Mr. Creech following the execution of that form, with

1440

1   or without a tape recorder?

2        A  Well, my initial interview was without the tape recorder.

3   And then...I asked that...the tape recorder be brought in, ...if

4   it was all right with Mr. Creech that we...interview the...pro-

5   ceedings, and he agreed.  And so one was brought in.

6        Q  Okay.  Were you successful in conducting your interview

7   at that time?

8        A  No I wasn't.

9        Q  Okay.  And again, why not?

10       A  Well, it was just too much noise from across the hall,

11  so...we concluded it and brought it to the...Sheriff's office

12  downtown.

13       Q  Okay.  Did you...then reinitiate the interview at the

14  Law Enforcement Building?

15       A  Yes we did.

16       Q  Okay.  Was that tape recorded?

17       A  Yes it was.

18       Q  In your own words, will you just...tell us, and try to

19  follow chronologically as well as you can, what course the inter-

20  view took, and...what...Mr. Creech told you, at least initially,

21  with regard to that interview?

22       A  Basically, the story was...of the incident that happened

23  the prior day, and what had happened.  Mr. Creech...told me...

24  that he had...killed...Mr. Jensen, that they had had an argument

25  over...some syrup that had been spilled on the floor.  And they

1445

1    had had a couple of arguments over the television, and a few other

2    things.  And that...Mr. Jensen...was...a threat of some sort to

3    a friend of Mr. Creech's in the penitentiary.  And that there was

4    a possible ability of a...problem between...this friend of Mr.

5    Creech's and Jensen.  And therefore,...Tom had...gotten in an

6    argument with him, they had had a fight over it, and he had

7    killed him.  That was the initial interview.  There was some...

8    question as to...some of the...parts of that particular...story.

9         Q  Now the story-- let me-- if I can interrupt you?  The

10   story that you got with regard to the-- the fight itself, was

11   that similar, as far as you know, with the-- with the version

12   that Mr. Creech had given to Dan Douthit the day before?

13        A  Yes.  It was...along those same lines.

14        Q  Okay.

15        A  As we.....

16        Q  Go ahead.  What happened next?

17        A  As we continued the interview, we felt that there was

18   some conflicts, or there was some differences in the...particular

19   story.  So...we were pointing them out to...Tom, and...he stated

20   that he didn't particularly want to talk about 'em, because of

21   conflicts out at the penitentiary, if he had problems out there,

22   and went back out.  So he didn't particulary want to talk about

23   'em anymore.  So, at that time we shut the tape recorder off, and

24   we visited some further.  And then...we went back on the tape,

25   and...the-- reinterviewed, and...he straightened out those

1451

1  particular parts of the story that we felt were...not correct.

2      Q  Now what-- what was his motivation to...change whatever

3  he changed with regard to his version of the-- of the situation,

4  do you know?

5      MR. KEHNE:  Objection.  It calls for mind reading.

6      THE COURT:  What was the question, again?

7      MR. HARRIS:  Well, did.....

8      MR. KEHNE:  What was his motivation.

9      MR. HARRIS:  Let me re-- let me rephrase it.

10     THE COURT:  Alright.  Very well.

11     Q  Did Mr. Creech express to you why he was willing to

12  change his version of what occurred between the first version he

13  gave you, and what evidently was the second version?

14     A  Yes he did.

15     Q  And what was that?

16     A  ...We-- Mr. Creech was concerned about...the press,

17  and...the people at the penitentiary finding out what...had gone

18  down.  And his...talking to me.  And so...I assured him that, no

19  way would I...let this out to the press, and that...it would not

20  be brought out, unless it was brought out in court.  And so he

21  then agreed to go ahead and tell me exactly what had happened.

22     Q  Did he agree to turning the tape recorder back on at

23  that time, as well?

24     A  Yes.

25     Q  Okay.  Go ahead and now, if you would, and as

1455

1    specifically as you can, relate what he told you after the tape

2    recorder was turned back on that morning?

3         A   He told me that...he had...visited with another inmate

4    over...the problem with an inmate by the name of Shannon (phonetic)

5    who he was a protector of.  And this is what the argument had

6    arisen over.  The other inmate had advised him that he should

7    probably go ahead and...do Shannon (phonetic) in, as he put it.

8         Q   Do-- do.....

9         A   Or, Jensen in, because he was a...threat to Shannon

10   (phonetic).

11        Q   Okay.

12        A   And...kind of coached this thing  as a...contract type

13   killing.  I'd talked with Tom, and that was a...area that I

14   thought there might be somebody else involved in it.  And he said

15   there was.  So...we visited on, and-- and he continued to tell

16   me, he says, basically what happened was that...he had taken a

17   toothbrush-- or before that, I guess, if I can fall back and-- on the

18   way the story happened.  Jensen had approached him while he was

19   up near the...front of the...cell house.

20        Q   Him meaning, Creech?

21        A   Yes.  He was up...near the front of the cell house

22   making coffee.  Jensen had approached him with a weapon that was

23   a-- a...socks with a-- batteries in it, had swung it at him.  He

24   had taken it away from him, and.....

25        Q   Now is this the first version, or the second version?

78                          Palmer
                            Plf-Di

1461

1    A   This was the second version.

2    Q   Alright.

3    A   And then he took the...sock...with the batteries away

4    from him, and...Jensen then went back to his cell, and went to

5    shower.  He talked with...another inmate, later, and had the

6    batteries and the sock in his possession at that time.  And...

7    the other inmate advised...Tom that...he should make a weapon

8    and give it to him, and he would give that weapon to...Jensen.

9    Jensen, again, was to approach him.  And...Tom had watched Jensen

10   as he...came out of the shower, went into his...cell.  He was

11   concerned that...Jensen would go to the guards and tell them that

12   they had been in an altercation, and that-- that...he would get

13   in trouble for it.  So he was trying to keep him from talking to

14   the guards.  And...he had taken a...toothbrush, and a razor blade

15   from his cell.

16   Q   Who had?

17   A   Tom had.

18   Q   Okay.

19   A   From his cell, given it to Bud Balla.  And...Balla

20   had given it to...Jensen.  Jensen came out of his cell after he

21   had showered, went back into his cell, and started back out of

22   his cell.  Tom was watching him, and he had the...socks with the

23   battery in it behind him, covered up in a towel.

24   Q   How did Creech get the batteries and the sock (indis-

25   cernible)?

Palmer
Plf-Di

1466

1    A  He originally got those batteries and sock from another

2  inmate.....

3    Q  Creech had?

4    A  Yes.  He got the batteries from...another inmate who

5  had 'em in his...radio.  And he put 'em in one of his socks.....

6    Q  One of Creech's socks?

7    A  .....and made him the weapon.  Yes.  Then...he...put

8  the weapon behind him, covered it up in a...towel, and as...Jensen

9  started to come back out of his cell, Tom said that he knew he

10  had the...toothbrush and the...razor blade taped together as a

11  weapon.

12    Q  So according to the second story, ...had Jensen ever

13  had the socks in his possession, the sock and the batteries in

14  his possession?

15    A  Yes.  He had them originally...in his possession, and

16  Tom had taken them away from him.

17    Q  Oh, okay.

18    A  At-- at the first scuffle.

19    Q  Okay.  But-- but Tom had put the thing together, is

20  that right?

21    A  Yes.

22    Q  Okay.  How did Jensen get them from Tom initially?

23    A  He got 'em from Balla.

24    Q  Okay.  Go ahead.

25    A  Then...to the scuffle that took place as Jensen started

1470

1    to come back out of his cell, Creech came around the corner,

2    and met him in the cell door.   And...Jensen had...the weapon,

3    which was a toothbrush and the...razor blade strapped to it.   He

4    said that he was...somewhat of a spastic, 'cause I would-- and...

5    couldn't handle himself very well, but he was making some.....

6         Q   Who was-- who was a spastic?

7         A   Jensen.

8         Q   Okay.

9         A   Jensen was making some overt movements towards him,

10   and...he said that he shoved him back against the wall, hit him

11   between the eyes with the sock full of batteries.   He said, blood

12   squirted out between his eyes, and came down over his face.   And

13   he knocked him against the...wall, and he kind of slumped down

14   behind the...bed, and the wall, and...was trying to get up.   He

15   said he hit him a couple three more times with it, and the guy

16   was floundering around, trying to get up.   He stomped him, and

17   kicked him around the throat, head, body.   He left the-- the...

18   cell, went out, started to his cell to...wash up a little bit.

19   Then he came back out and talked with...Balla, and...said that...

20   the guy was not dead, he should go back and finish the job.

21        Q   Who said that?

22        A   Balla.....

23        Q   To.....

24        A   .....told Creech that.

25        Q   Okay.   Go ahead.   What did Creech do then?

1475

1    A  He went back in and stomped him on the throat some

2  more, and...came back out, and...one of the guards came by and

3  he waved at him, that there was no problem, 'cause Mr. Balla had

4  said that...he should give him a little more time to die.  And...

5  he said that he was hurt bad and was gonna die anyway.  So, the

6  guard left, came back a few minutes later and noticed that he

7  had some blood on him.  He refused to lock up.

8    Q  Who was he, Creech?

9    A  Tom.

10   Q  Okay.

11   A  Yes.  And...they came in and...went in.  He told them

12 that...there had been a problem, he wasn't hurt too bad, but the

13 guy in cell number five was pretty bad-- or six, was in pretty

14 bad shape.  And...they administered firstaid to him, moved the

15 body out.

16   Q  Okay.  Was it your understanding from the second version

17 then, that...Mr. Creech knew that...Jensen had been given the--

18 the toothbrush and razor blade?

19   A  Yes.

20   Q  Okay.  Whose toothbrush was it?

21   A  It was his toothbrush, Tom's toothbrush.

22   Q  And whose razor blade?

23   A  It was his razor blade.

24   Q  Okay.  Who had put it together?

25   A  ...Bud Balla.

1480

1       Q   Okay.   And he was aware that-- Creech was aware then,

2    according to his version, that-- that Balla would be giving that

3    weapon to Mr. Jensen?

4       A   Yes.   As I understand it, there was a preplanned thing

5    there, that-- there had been some arguments between...some of the

6    other inmates and...Jensen, and that...Tom was going to kill him

7    for it.   It was...a contract, I think.

8       Q   Alright.   And then...the toothbrush, razor blade, was

9    simply a-- what was the purpose in that, according to Mr. Creech?

10      A   Well, it was to give Jensen something to...fight with,

11   or to make-- to force-- to give Jensen something, 'cause he

12   wasn't in shape to do anything to anybody.   And at-- to bolster

13   up his...confidence that he could maybe handle Creech.   That's

14   the way I understood it.

15      Q   So, for selfdefense, defense, is that what you're

16   saying?

17      A   Yes.

18      Q   Is the Tom Creech who gave you these two statements, on

19   the 14th, present in court here today?

20      A   Yes.

21      Q   Okay.   Could you point him out for the record?

22      A   He's the Defendant.

23      MR. HARRIS:   Okay.   Could the record reflect that the

24   witness has identified the Defendant?

25      THE COURT:   Yes, it may so show.

1484

1    MR. HARRIS:  That's all I have.

2    THE COURT:  Cross examine.

3    MR. KEHNE:  Thank you, Judge.

4

5                    CROSS EXAMINATION

6    BY MR. KEHNE:

7        Q  I think maybe you lost me, Sheriff.  Will you run

8    through this chain, of all the hands those weapons went into,

9    according to the second version?

10       A  Originally, the battery and the socks, the batteries

11   came from another individual.

12       Q  Do you know that person's name?  Was it stated?

13       A  I haven't stated his name before.  I can't remember it

14   right off.  A Mexican fellow, in...one of the cells out there.

15       Q  Okay.  It came from another inmate, and then where did

16   it go?

17       A  Through Mr. Creech it went to Mr. Balla.  And then,

18   from Balla, to Jensen.  From Jensen, Tom took it away from him.

19   And then, as far as the other weapon was concerned, that was...

20   Tom's toothbrush, and his razor blade, came from his cell, to

21   Balla.

22       Q  Did he tell you where he got those?

23       A  Yes, out of his cell.

24       Q  No, I mean before they got into his cell.  Did he

25   mention.....

1488

1     A  He got 'em from the penitentiary issue.

2     Q  Oh, that wasn't a contraband razor blade?

3     A  I...don't know whether it was or not.  He said he had

4  it in his cell.  I--

5     Q  Okay.

6     A  I don't know the circumstances, whether they give 'em

7  razor blades out there to keep in cells, or not.

8     Q  Okay.  Go ahead.  From Tom's cell then it went where,

9  through what hands?

10    A  It went to Balla, and from Balla back to Jensen, and

11  from Jensen, it was found on the floor in his cell.

12    Q  Okay.  Thank you.  Now, Tom got all five batteries from

13  somebody else?

14    A  That's my understanding.

15    Q  Now this second version that you've testified to, is

16  that entirely on tape, all of that is on tape?

17    A  Yes it is.

18    Q  And is this true, you had two tape recorders running?

19    A  No, that's not true.  When it was in my office, I only

20  had one tape recorder going at that time.  If there was two.....

21    Q  So.....

22    A  .....tape recorders going, I understand that they--

23  that they-- other officers had talked to Tom at another time.....

24    Q  Okay.

25    A  .....in another place, and there was two tape recorders.

85                    Palmer
                     Dft-X

1492

1   But at the time he was in my office, there was only one, and

2   that's the one that I'm referring to.

3        Q   Okay.  I can look at the transcript for a lot of it,

4   but I'm real interested in what happened when you turned the

5   tape recorder off, and you and he talked some more, okay?

6        A   There was no other tapes going at that time,.....

7        Q   Right.

8        A   .....in my office, and we were just talking.

9        Q   Okay.  While you were just talking, you said that you

10  brought to his attention some problems you thought about his

11  earlier version.....

12       A   Yes.

13       Q   .....is that right?  Can you be more specific and tell

14  me what problems you pointed out to him?

15       A   I think the...thing that...was bothering me, that I

16  thought he might be not telling the truth on, was...the fact that

17  he had given the...batteries back to Jensen.  In the first story

18  he said that he had threw 'em back in his cell.  I couldn't

19  understand a man having a weapon and giving it back to a guy he

20  was fighting with.  I pointed that out.  That was an inconsistancy

21  We didn't feel he was telling the truth on that.  I talked with

22  Tom on numerous occasions on other murder cases, and I knew that

23  he had accepted money, and I knew that-- that-- I thought there

24  might be a possible contract...out there, because...of other

25  inmates being involved.  I thought that was a possibility.  I

86                    Palmer
                      Dft-X

1497

1    knew that there was other inmates that had been shipped into

2    Seven House, for...no other reason than...protective custody.

3    I felt that...there was some problems in that line.   That  was

4    just my thinking.  And that-- those inconsistancies, and those

5    questions, that I had in my mind.   I talked to him about the--

6    the interview, the interrogation, together, was...what was going

7    on at that time.

8        Q   About how long was the tape recorder off during that

9    period?

10       A   I would guess in the neighborhood of thirty minutes,

11   or less.

12       Q   What's the least you would estimate it was?

13       A   Fifteen.

14       Q   Was the-- during that period of time, was there any

15   discussion about his various rights, like to a lawyer or silence?

16       (pause)

17       A   Yes.

18       Q   Okay.  Will you detail that for me please?

19       A   Yes.  I-- I advised him, now, look, do you understand

20   we're going back on the tape, and do you want to talk to me,

21   and it's a very serious thing, it's...a first degree murder thing.

22   And he said, yes, I understand that.  And I said, are you willing

23   to tell me.  And he says, I just don't want this to go out in the

24   press.  It was very specific that he didn't want the press to

25   know about it.  He was concerned about...a possible conflict of

1502

1 interest, because you people might be...defending Balla. And...

2 if he-- he didn't want Balla to find out about that. And I still--

3 I assured him that it was-- would not come out unless it came

4 out in court. And that...if we were going to be investigating

5 this situation, that was a big problem that...I seen right there.

6 He--he was-- he didn't want that to come down out at the peniten-

7 tiary because if he had to go back out there, well...things would

8 not be good.

9     Q Did he ever, during your discussions, tell you why he

10 was willing to cooperate and give statements?

11     A With me?

12     Q Right.

13     (Pause)

14     A Yes, I-- I guess he did. ...We've been friends, if you

15 can put it that way. I've known him a long time, and...I guess

16 probably, he figures if he's got a friend in the world, maybe I'm

17 one of 'em. We always got along good, and so he agreed to tell

18 me what had happened. And...I told him, you know, you might be

19 facing the death penalty. He says, "I don't really care, it

20 doesn't make that much difference to me."

21     (Pause)

22     Q Now other than the period of time at your office, when

23 the tape recorder was out, you also got-- had a discussion with

24 him at the penitentiary which was not tape recorded, right?

25     A I didn't get that question. Would you repeat it?

88                Palmer
                               Dft-X

1507

1    Q   Okay.  I'm trying to tie it-- what I'm doing here is,

2    trying to tie down everything he said when the tape recorder was

3    off, cause everything tape recorded, of course, I can listen to

4    the tape.  You also talked to him at the penitentiary with the

5    tape off, the same day that you talked to him in the office,

6    right?

7        A   Yes.

8        Q   And the stories were inconsistant between the peniten-

9    tiary statements and those in the office?
                    (There)
10       A   ...They were some inconsistancies, not very many.

11       Q   Can you be specific, and detail those for me?

12       (Pause)

13       A   The first stories that he told, he told them to...Mr.

14   Douthit.  And they'd been repeated to me.  And...I'm somewhat

15   vague on-- on the first stories, the stories that he first told

16   me out there, there was a lot of confusion.  I've already told

17   you some of the things that I had questions about.  ...The-- the

18   fact that-- that he had put the batteries back in-- in Jensen's

19   cell after the first scuffle.

20       (Pause)

21       A   Was-- was one of the main ones.  There was just a couple

22   there that-- that was bothering me.

23       Q   Okay.  Can you remember anything about the Miranda

24   rights, warnings, in-- that happened at the penitentiary, as far

25   as oral statements made by Mr. Creech?  Well, sometimes people

1513

1   will talk while they're filling out the forms.  And I wondered

2   if there was any discussion of any of those rights at the peniten-

3   tiary.

4        A   Not particularly.  He read 'em over.  We had talked
                                              (understood)
5   about Miranda many times, and...I asked him if he understand 'em,

6   or-- it's kind of been a standing joke between him and I, that

7   he understands them better than I do, and more or less it was

8   for the courts, not him or me.  He understood 'em perfectly.

9        Q   So there was really no discussion about whether or not

10  he'd have a lawyer, or anything like that, is that what you're

11  saying?

12       A   Yes,...in the rights.  He's got a right to a lawyer

13  and.....

14       Q   Right.  No, I'm talking about oral conversations, in

15  addition to him reading the rights?

16       A   No.

17       MR. KEHNE:  Okay.  That's all.  Thanks.

18       THE COURT:  Any redirect?

19       MR. HARRIS:  Nothing further.

20       THE COURT:  You may step down.  Can this witness be

21  excused?

22       MR. HARRIS:  Please, Judge.

23       MR. KEHNE:  No objection.

24       MR. HARRIS:  That's all I have, Judge.  I'll rest at this

25  point.

1516

1       A   Judge.....

2       THE COURT:  You are excused.  You're free to go.

3       A   .....before I go, if-- are-- when we're through here,

4   I would like to take Mr. Creech back out to the jail.  So, can

5   I stay until.....

6       THE COURT:  Sure.  Uh-huh.

7       A   ....this is complete?

8       MR. HARRIS:  Sure.  That's all the evidence I have, Judge.

9   I would rest.

10      THE COURT:  Alright.  The State rests.  Any evidence by

11  the Defense?

12      MR. KEHNE:  May I confer with Mr. Creech for a couple of

13  minutes.  I wouldn't expect there will be any, but.....

14      THE COURT:  You may.

15      (Pause)

16      MR. KEHNE:  We'll rest, Your Honor.

17      THE COURT:  Alright.  Both sides rest.  Anything further

18  then, motion or argument?

19      MR. HARRIS:  Well, Your Honor, I would move that...this

20  Court bind over the...Defendant on the crime charged.  This is

21  kind of a unique complaint, even as a murder complaint, in that

22  it alleges specific statutory...first degree murder, not common

23  law first degree murder.  We have alleged pursuant to 18,4003,

24  I think that's the statute, that this is in fact first degree

25  murder, not based on common law, premeditation, but based on the

1522

1   status of this Defendant at the time that the murder took place.

2   We have therefore alleged...only the malice, a forethought element

3   and not...the premeditation, which we don't feel is necessary

4   pursuant to the statute, in that this Defendant did have a status

5   required by that statute, that of being, first of all, under a

6   sentence for murder in the first degree...in the penitentiary,

7   and secondly, separate section in the statute, that the murder

8   was perpetrated upon an inmate in the State penitentiary.  Both

9   of those being sufficient for a first degree murder conviction,

10  independant of any premeditation.  And...I think that certainly

11  the evidence is sufficient to...meet the...malice requirement .

12  in this case.

13          THE COURT:  Alright.  Mr. Kehne, anything further?

14          MR. KEHNE:  No, Your Honor.

15          (Pause)

16          THE COURT:  Well, it does appear there is sufficient

17  evidence to hold the Defendant to answer on the charge of first

18  degree murder, under that code section.  And the Court will do

19  so.  I think...partially that's based on some of the Defendants

20  own statements made after he'd been given his Miranda Warnings,

21  and was fully advised of his rights, and voluntarily talked to

22  the officers, and made those statements, which were tape recorded.

23  And he apparently, willingly did all that, and was fully aware

24  of his rights.  And so I think there is sufficient reason to hold

25  the Defendant to answer, and I'll do so.  And I would remind

1534

1    Counsel...and court personnel of the previous gag order, that's

2    been imposed by the Court will be continued in effect, so that

3    I expect that no evidence...from this preliminary hearing gets

4    into the press or the paper.

5        MR. HARRIS:  Your Honor, in that regard I do have a motion.

6    I would move that...if and when a transcript is prepared from

7    this tape recording for purposes of trial, that it be sealed by

8    the County Clerk's office, released only to those individuals

9    with legitimate court purposes, for the transcript, and that it

10   be considered sealed, and kept out of the...open court file for

11   purposes of...trial, pursuant to the court order.

12       THE COURT:  Alright.  Any problem......

13       MR. KEHNE:  I agree with that.

14       THE COURT:  .....with that?

15       MR. KEHHE:  I agree with that.

16       THE COURT:  Alright.  I'll do so.  And I'll advise the...

17   Marshall Hadzor, in charge of the preparation of the transcript,

18   that it will be a sealed transcript.

19       MR. HARRIS:  I have one more motion too, Judge.

20       THE COURT:  Okay.

21       MR. HARRIS:  I would move pursuant to the statute, for

22   release of all the exhibits entered in this case...for purposes

23   of use at trial.

24       MR. KEHNE:  I don't have any problem with that.

25       THE COURT:  Alright.  Do you want those returned to the

93

1539

1    Prosecutor's file then, or.....

2        MR. HARRIS:   Yes, please, Judge, if we could?

3        (Pause)

4        MR. HARRIS:   The single exception to that motion would be

5    State's Exhibit No. 11, which can remain in the Court's file.

6    I'd presume that all the other exhibits will be reintroduced at

7    trial.

8        (Pause)

9        THE COURT:   Alright.   I have the photographs, State's 1

10    through 10.   11 then, can go in the Court file.   And 12 and 13,

11    the two rights forms will be returned to the Prosecutor's file.

12    That's probably a good idea anyway, and then we won't have these

13    photographs as part of the...Court file, that somebody might have

14    access to.   So I'll order them returned to the Prosecutor's file.

15        (Pause)

16        (Sotto voce)

17        THE COURT:   And I'd also advise Counsel that my notes

18    taken during this hearing are not going to be placed in the Court

19    file, but will be held by me, and be destroyed, my personal notes

20    taken during the hearing.   Okay.   Thank you.

21

22

23

24                        T H E   E N D

25

I do hereby CERTIFY:

That the foregoing is a true, accurate, and complete transcript of the said proceeding, to the best of my ability, knowledge, and belief.

IN AFFIRMATION THERETO, I have hereunto set my hand this 11th day of August 1981.

_____
Presiding Magistrate or Clerk

Dainc Little, and Laurie J. Scott
_____
Prepared by

August 11, 1981
_____
Date Prepared